UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

| | |
|---|---|
| JULIE A. SU, Acting Secretary,<br>United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>ARGENT TRUST, CO., HERBERT WETANSON,<br>GREGOR WETANSON, JOSEPH SHPIGEL, and<br>the W BBQ HOLDINGS, INC. EMPLOYEE<br>STOCK OWNERSHIP PLAN,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 1:24-cv-9809<br><br>COMPLAINT FOR ERISA<br>VIOLATIONS<br>(29 U.S.C. §§ 1001 *et seq.*) |

------------------------------------------------------------

Plaintiff Julie A. Su, Secretary of the United States Department of Labor (the "Secretary"), alleges as follows:

## PRELIMINARY STATEMENT

1.     The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, requires fiduciaries to employee stock ownership plans, when buying company stock on the plan's behalf, to act prudently and with undivided loyalty to the plan, and to pay no more than fair market value for the stock. When Argent Trust Co. ("Argent"), as trustee of the W BBQ, Inc. Employee Stock Ownership Plan (the "ESOP"), in July 2016 caused the ESOP to pay $92 million for 80% of the stock in W BBQ Holdings, Inc. (the "ESOP Transaction"), it failed in each of these respects.[1]

2.     Rather than conducting its own diligence, Argent rubberstamped the valuation of its appraisal firm, Stout Risius Ross, LLC ("SRR"). In doing so, Argent relied on a report that

---

[1] A net working capital adjustment in October 2016 retroactively amended the sale price to $98.8 million.

was rife with red flags, including seller-prepared financial projections of W BBQ Holdings, Inc.'s ("W BBQ") future growth that far outstripped historical performance and disregarded risks, and relied on guideline company selections that were not comparable.

3.      Rather than negotiate in good faith, Argent did not ensure that the ESOP Transaction price accounted for the potential dilutive effect of warrants issued to the four selling shareholders and allowed the ESOP to pay for a controlling interest in W BBQ, despite selling shareholders Herbert Wetanson, Gregor Wetanson, and Joseph Shpigel (the "Seller Defendants") retaining key elements of control. Ultimately, Argent agreed to terms that disproportionally favored the selling shareholders.

4.      Rather than protecting the ESOP's interests after the transaction as successor trustee, Argent instead allowed an independent seat on the board of directors to go unfilled for years and failed to vindicate the ESOP's rights under a trademark licensing agreement with the selling shareholders, permitting Seller Defendants to compete with business they had sold to their employees.

5.      Seller Defendants Herbert and Gregor Wetanson appointed Argent to act as the ESOP's discretionary, and later the successor, trustee and had a concomitant fiduciary obligation to monitor Argent's performance. All three Seller Defendants are also liable for any of Argent's fiduciary breaches that they participated in, or knew about but failed to remedy.  The Seller Defendants failed in these respects.

6.      The Seller Defendants prepared and provided overly optimistic projections of W BBQ's future financial performance that both Argent and its appraisal firm relied upon. Notably, the Seller Defendants did not update these projections in the months leading up to the ESOP Transaction, despite W BBQ's revenue declining throughout the first half of 2016.

7.      The Seller Defendants knew that Argent failed to negotiate in good faith over the ESOP Transaction's terms, including the warrants they themselves received and limits to the ESOP's post-transaction control over W BBQ operations.

8.      The Seller Defendants also knew that Argent was allowing them to ignore ESOP Transaction terms with impunity, including commitments to promptly ensure appointment of an independent member to W BBQ's board of directors and to cease operating Dallas BBQ locations inside territory designated for W BBQ in the trademark licensing agreement.

9.      As a result, the Secretary brings this action against Defendants under 29 U.S.C. § 1132(a)(2) and (5) to redress Defendants' violations and enforce ERISA Title 1.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

11.     Venue properly lies in the United States District Court for the Southern District of New York, under 29 U.S.C. § 1132(e)(2), because the ESOP is administered in this district, and the violations at issue occurred within this district.

## PARTIES

12.     The Secretary is vested with authority to enforce ERISA Title 1, including by filing and prosecuting claims against fiduciaries and other parties who violate ERISA.  29 U.S.C. §§ 1132(a)(2), (5).

13.     Argent is a full-service wealth-management firm with its principal place of business in Atlanta, Georgia.

14.     Argent's services include acting as the trustee of employee stock ownership plans.

15.     Beginning in 2016, Argent was the ESOP's trustee and a fiduciary to the ESOP

3

under 29 U.S.C. § 1001(21).

16.     Since before 2016, selling shareholder Herbert Wetanson was W BBQ's President, and a member of W BBQ's board of directors. Leading up to the ESOP Transaction on July 29, 2016, and for almost two years afterwards, Herbert Wetanson and his son, Gregor Wetanson, were W BBQ's only board members.

17.     Herbert Wetanson, along with Gregor Wetanson, appointed Argent as ESOP trustee, administered the ESOP until the Transaction was complete, and reserved the power to retain or remove Argent as the ESOP's trustee after the transaction.

18.     Before the ESOP Transaction, Herbert Wetanson owned approximately 47% of W BBQ's stock.

19.     Herbert Wetanson was, thus, a fiduciary to the ESOP under 29 U.S.C. § 1001(21) and a party in interest to the ESOP under 29 U.S.C. §§ 1002(14)(A) and (H).

20.     Since before 2016, selling shareholder Gregor Wetanson was W BBQ's Vice President, Chief Executive Officer, and the primary person responsible for overseeing the restaurants' day-to-day operations.

21.     Since before 2016, Gregor Wetanson was a member of W BBQ's board of directors. Leading up to the ESOP Transaction on July 29, 2016, and for almost two years afterwards, Gregor Wetanson and his father were W BBQ's only board members.

22.     Before the ESOP Transaction, Gregor Wetanson owned approximately 47% of W BBQ's stock.

23.     Gregor Wetanson, along with Hebert Wetanson, appointed Argent as plan trustee, administered the ESOP until the transaction was completed, and reserved the power to retain or remove Argent as the ESOP's trustee after the transaction.

24.     Gregor Wetanson was, thus, a fiduciary to the ESOP under 29 U.S.C. § 1001(21) and a party in interest to the ESOP under 29 U.S.C. §§ 1002(14)(A) and (H).

25.     At all relevant times, selling shareholder Joseph Shpigel was W BBQ's Chief Financial Officer.

26.     Before the ESOP Transaction, Shpigel owned 2% of W BBQ's stock.

27.     At all relevant times, Shpigel was a party in interest to the ESOP under 29 U.S.C. § 1002(14)(H).

28.     The ESOP is an ERISA-covered employee benefit plan under 29 U.S.C. §§ 1002(3) & 1003(a)(1).

29.     The ESOP is joined as a party defendant under Federal Rule of Civil Procedure 19(a) solely to assure that complete relief can be granted.

## FACTUAL BACKGROUND

**The Seller Defendants initiated the ESOP Transaction with a view toward maximizing financial gain while retaining control over W BBQ.**

30.     Before the ESOP Transaction, four selling shareholders operated twelve restaurants in New York City, including ten under the Dallas BBQ brand.

31.     To facilitate the ESOP Transaction, the selling shareholders consolidated nine of those Dallas BBQ locations and the restaurants' management company to form W BBQ.

32.     In March 2015, Gregor Wetanson, acting on behalf of W BBQ and its selling shareholders, hired CSG Partners, LLC ("CSG") to evaluate the feasibility of implementing a leveraged ESOP.

33.     To that end, CSG gave an "ESOP Structural Analytics" presentation in July 2015, cataloguing how an ESOP would financially benefit the selling shareholders.

34.     In that presentation, CSG proposed a structure whereby the selling shareholders

would sell 80% of W BBQ's stock to the ESOP outright, then convert 20% of W BBQ's

outstanding stock into warrants to obtain the right to reacquire 40% of W BBQ from the ESOP.

35.    Specifically, CSG pitched that this structure "locks in 80% of the Company value

for Shareholders, while allowing them to retain upside through 40% warrants."

36.    Also in that presentation, CSG noted that a key ESOP transaction objective was

enabling W BBQ's selling shareholders to "retain control over business operations."

37.    Indeed, the Seller Defendants rejected "other options" for selling W BBQ because

they "did not allow [them] to maintain control of the operations."

38.    In October 2015, W BBQ engaged CSG to quarterback the contemplated ESOP

transaction.

39.    As part of its duties, CSG agreed to manage the "ESOP implementation process,"

prepare a "consolidated financial model and corporate summary" for W BBQ, and negotiate the

transaction's price and terms with the ESOP trustee on behalf of W BBQ.

**The Seller Defendants provided Argent's appraiser with projections based on incomplete
data, biasing the valuation.**

40.    In November 2015, Hebert and Gregor Wetanson engaged Argent to act as the

ESOP's trustee, charged with ensuring that the plan did not pay more than fair market value for

W BBQ's stock and with negotiating material terms on the ESOP's behalf.

41.    That same month, Argent engaged SRR to act as its appraiser.

42.    As part of its duties, SRR agreed to complete a valuation of W BBQ and provide a

written opinion as to the proposed transaction's fairness (the "SRR Report").

43.    SRR agreed to review W BBQ's past performance, future forecasts, and

anticipated projections in rendering its valuation opinion. However, SRR specifically disclaimed

that it would rely on the "accuracy and completeness" of information provided by W BBQ's

management and would not compile, review, or audit that information or "express an opinion or any form of assurance thereon." SRR also noted that they would not assess the transaction's "procedural fairness or prudence."

44.     When selecting which restaurant locations to include under the W BBQ umbrella for purposes of the ESOP Transaction, the Seller Defendants openly cherry-picked restaurants with the goal of increasing the final sale price, and the final payout for themselves.

45.     For example, Shpigel noted that the Seller Defendants excluded one location because it, "was losing around $400,000 per year and we felt it would dilute and reduce the value of the ESOP. It would reduce the cash flow projections, the EBITDA."

46.     CSG representatives for the selling shareholders internally contemplated whether "the trustee [would] have an issue with us excluding locations based on holding/performance," but Argent did not flag or negotiate over whether it was proper to exclude the underperforming locations in the ESOP Transaction.

47.     As a result, the cherry-picking created a survivorship bias in W BBQ's historical data and same-store sales growth projections, which did not incorporate information from failing or recently closed locations.

48.     In addition, there was an approximately seven-month delay between the ESOP Transaction price's negotiation in December 2015 and the ESOP Transaction's finalization in July 2016. The Seller Defendants' projections did not properly account for changes in W BBQ's fortunes during the first half of 2016.

49.     Specifically, W BBQ's performance was already lagging its projections by mid-2016, yet the Seller Defendants did not provide financials for June or July or otherwise seek to update their previously provided projections.

**Argent failed to probe the numerous red flags in SRR's valuation report.**

50.     Ultimately, the SRR Report concluded that an 80% stake in W BBQ was worth between $86.6 million and $100.2 million.

51.     This conclusion as to W BBQ's value rests on several valuation errors.

*SRR relied on overly aggressive projections of W BBQ's growth and earnings and failed to account for known risks.*

52.     One of the methods that SRR used to value W BBQ was the discounted cash flow ("DCF") method, which values a company by projecting its future free cash flows—that is, the money available to the company's owners after all expenses are paid—and discounting them to their present value equivalent.

53.     To project reasonable future cash flows, the appraiser must first start with reasonable and justifiable projections for the company's anticipated revenues and expenses because higher projected revenues or lower projected expenses will inflate the company's valuation.

54.     In applying the DCF method, SRR relied on overly aggressive projections of W BBQ's revenue and profit margins, which were internally prepared and provided by the Seller Defendants.

55.     For example, the Seller Defendants' projections assumed annual same-store sales growth of 3% to 5% per year at W BBQ's existing restaurants.

56.     W BBQ's historical average growth by location, however, showed no discernable pattern and negative simple average growth. The SRR Report therefore relied on a wildly optimistic growth rate.

57.     SRR also knew that the Seller Defendants' projections were based on a set of cherry-picked locations, and therefore not representative of the entire business, but it treated the

8

excluded locations as irrelevant to the valuations analysis instead of accounting for the risk that some existing or future W BBQ locations could similarly fail or lose money.

58.    In addition, SRR knew that the Seller Defendants' projections were outdated by the time of the ESOP Transaction, and did not reflect W BBQ's declining revenues in early 2016, but SRR and Argent simply accepted management's unsupported assurances that W BBQ could still meet its targets.

59.    Seller Defendants further projected, based largely on Gregor Wetanson's speculative intent, that W BBQ would open new restaurant locations in 2016, 2018, and 2020.

60.    However, the SRR Report failed to probe whether such expansion was realistic for W BBQ given that its trademark licensing agreement with the selling shareholders, entered into at the time of the ESOP Transaction, confined W BBQ's growth to specific territory in and around New York City, Connecticut, and parts of New Jersey.

61.    The SRR Report also did not properly account for cannibalization risk—i.e. the possibility that sales from new restaurants would reduce sales at existing restaurants as the brand's customers spread out across more locations—of particular concern given the limited territory that W BBQ had in which to expand.

62.    Post-Transaction valuation reports show that W BBQ failed to expand at the unrealistic pace put forth in the Seller Defendants' projections. Indeed, SRR's December 2017 valuation report projects no new locations going forward.

63.    SRR's blind reliance on the Seller Defendant's inflated projections, which Argent failed to probe, inflated W BBQ's valuation.

*SRR valued W BBQ using improper guideline companies.*

64.    In addition to the discounted cashflow method, SRR valued W BBQ using the

guideline public company method, which uses data from similar companies of known value to develop pricing multiples to value private companies.

65.     For the guideline public company method to be accurate, it must rely on comparable companies.

66.     However, all eleven companies selected by SRR are national restaurant chains, whereas W BBQ only operates in New York City.

67.     Moreover, all the guideline public companies that SRR selected differ significantly from W BBQ in terms of product diversification, brand recognition, and size.

68.     Annual sales for the selected guideline public companies ranged from $65 million to $7.6 billion with a median of $2.2 billion.  In contrast, W BBQ reported annual sales of $87.4 million in 2017—just 3.9% of the guideline public companies' median revenue.

69.     SRR's use of incomparable guideline companies, which Argent failed to probe, inflated W BBQ's valuation.

**Argent and the Seller Defendants failed to negotiate the ESOP Transaction's terms in good faith.**

*The Seller Defendants pursued, and Argent accepted, a warrant structure that would dilute the ESOP's interests.*

70.     From the earliest discussions in July 2015, CSG proposed a structure whereby the selling shareholders would convert 20% of W BBQ's outstanding stock into warrants to obtain the right to reacquire 40% of W BBQ from the ESOP.

71.     Ultimately, the ESOP Transaction adopted this warrant structure.  On the same day as the ESOP Transaction, W BBQ redeemed the selling shareholders' remaining 20% of W BBQ's common stock in exchange for 200 shares of newly-issued non-voting stock plus warrants to acquire 266,666 shares of common stock, together representing 40% of W BBQ's

equity on a fully-diluted basis. The warrants had an exercise price of $72.94 per share and were fully vested and exercisable from July 29, 2016, the ESOP Transaction date, to July 29, 2031.

72.     As a result, although the ESOP paid for 80% of W BBQ's equity and held 100% immediately following the ESOP Transaction, the Seller Defendants remained able to dilute the ESOP's ownership interest to 60% by exercising their warrants.

73.     Argent did not ensure that the final transaction price accounted for the dilutive effects such a warrant structure would have on the ESOP's ownership interest in W BBQ.

*The Seller Defendants retained functional control over W BBQ after the transaction without the ESOP receiving an appropriate price reduction.*

74.     Ultimately, the Seller Defendants and Argent agreed to terms that allowed W BBQ management, and primarily the Seller Defendants, to retain operational, financial, and strategic control over the company after the ESOP transaction.

75.     For example, the trust agreement provides that W BBQ's board of directors can remove Argent as trustee at any time by providing 30 days' notice.

76.     From July 29, 2016, until July 2018, Herbert and Gregor Wetanson were the only two members of W BBQ's board of directors.

77.     Following the ESOP Transaction, Gregor Wetanson has continued to direct W BBQ's day-to-day operations with input from his father, Herbert Wetanson, while Shpigel remains Chief Financial Officer.

78.     At all relevant times, Gregor Wetanson and Shpigel also made up the two-person ESOP Committee charged with administering the ESOP after the transaction.

79.     Among other powers, the ESOP Committee can direct how Argent, as ESOP trustee, votes on most corporate matters.

80.     Despite terms that locked in the selling shareholders' continued control over W

BBQ, SRR's Report valued the ESOP's ownership interest in W BBQ as a controlling interest and Argent approved that assessment.

**Argent failed in its obligation, as successor trustee, to vindicate the ESOP's rights after the transaction.**

81.     Since the time of the ESOP Transaction, Argent served as the Plan's successor trustee.

82.     As successor trustee, Argent committed to hold, own, and manage W BBQ's stock solely in the interests of plan participants and beneficiaries.

83.     In practice, however, Argent repeatedly neglected to enforce the ESOP's rights against the selling shareholders.

84.     For example, as part of the ESOP Transaction, W BBQ adopted a shareholder rights agreement that required the then-existing board of directors (i.e., Herbert and Gregor Wetanson) to cause Argent to appoint a third, independent director within six months of the transaction date. Herbert and Gregor Wetanson were also empowered to make interim board appointments.

85.     Seller Defendants Herbert and Gregor Wetanson allowed Argent to neglect its obligation to appoint an independent board member until July 2018, approximately two years after the ESOP Transaction was completed.

86.     Herbert and Gregor Wetanson also did not appoint an interim board member at any time between the ESOP Transaction date and July 2018, choosing instead to maintain a two-person board that only they controlled.

87.     In another example, the trademark licensing agreement put in place at the time of the ESOP Transaction awarded W BBQ the use of the Dallas BBQ trademark in and immediately around New York City, in Connecticut, and in parts of New Jersey.

88.     Under the trademark licensing agreement, the Seller Defendants can only open new Dallas BBQ locations outside W BBQ's allotted territory.

89.     Yet, the Seller Defendants continued to operate a Dallas BBQ location in New York City well after the ESOP Transaction date, competing directly with the ESOP-owned W BBQ locations for business.

90.     Instead of investigating or acting to enforce the ESOP's rights as the fiduciary successor trustee, Argent allowed the selling shareholders to violate the ESOP Transaction's terms with impunity.

**Argent required W BBQ to indemnify its potential fiduciary breaches.**

91.     Throughout Argent's time as the ESOP's fiduciary trustee, Argent executed several agreements purportedly requiring W BBQ, and by extension the ESOP, to indemnify Argent for potential fiduciary breaches.

92.     When Argent's intake committee formally accepted W BBQ as a client in November 2015, it executed an engagement letter confirming the terms of Argent's role as discretionary trustee for the proposed ESOP.

93.     That engagement letter contains a provision requiring W BBQ to indemnify Argent against all "claims, damages, expenses, fees, liabilities, and losses," including attorney's fees, from any legal proceedings or investigations concerning services provided by Argent related to the proposed ESOP, including services provided before Argent formally became the ESOP's trustee.

94.     The day of the ESOP Transaction, July 29, 2016, Argent and W BBQ executed a trust agreement formally adopting Argent as the ESOP's successor trustee.

95.     The trust agreement includes another provision requiring W BBQ to indemnify

Argent for any cost, expense, liability, or loss, including attorney's fees, from any legal proceedings or investigations concerning services provided by Argent under the trust agreement. The only circumstance in which W BBQ need not indemnify Argent is if a court, in a final judgment from which no appeal can be taken, holds that the cost, expense, liability, or loss resulted from Argent's fiduciary violations.

96.     Under these indemnification provisions, W BBQ could be obligated to indemnify Argent even if Argent violated ERISA, including if the parties settle this action.

97.     As W BBQ's majority shareholder, the ESOP would bear the burden of W BBQ's indemnification obligation if payments were made under this indemnification provision.

## FIRST CLAIM FOR RELIEF
### (Against Argent for Violating Its Fiduciary Duties)

98.     Under Federal Rule of Civil Procedure 10(c), the Secretary adopts and incorporates by reference the averments and allegations in all prior paragraphs.

99.     As the ESOP's fiduciary, Argent was obligated to act prudently and solely in the interest of the ESOP and its participants and beneficiaries.

100.     Argent was required to, among other things, investigate the transaction's merits and pitfalls in good faith; negotiate the transaction's price and other material terms in good faith; thoroughly review, analyze, and question any relied-upon valuation reports; and continue to act in the ESOP's interests as the plan's fiduciary after the transaction. Argent failed in each of these respects.

101.     First, Argent failed to scrutinize and critically question W BBQ's internally prepared financial statements and the SRR Report, which raised several red flags, including by:

a.     Relying on cherry-picked and outdated data without accounting for known risks, including restaurant closures and cannibalization;

14

b.      Projecting overly aggressive growth that far outstripped historical

performance; and

c.      Relying on comparisons to publicly traded companies that were not

comparable.

102.    Second, Argent did not negotiate in good faith over terms that were material to

the stock purchase price.  For example, Argent failed to negotiate over warrants issued to the

selling shareholders or to properly account for the warrants' dilutive effects. Argent also allowed

the ESOP to pay for a controlling interest despite the selling shareholders retaining many key

elements of control over W BBQ.

103.    Finally, Argent failed to promote the ESOP's interests as successor trustee after

the transaction. Instead, Argent allowed an independent seat on the board of directors to go

unfilled for years and failed to enforce the ESOP's rights under the trademark licensing

agreement with the selling shareholders.

104.    By failing in the ways listed above, Argent:

a.      Caused the ESOP to purchase W BBQ's stock for significantly more than

fair market value;

b.      Failed to act solely in the interest of the ESOP's participants and

beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable

plan administration expenses, violating 29 U.S.C. § 1104(a)(1)(A); and

c.      Failed to act with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar

with such matters would use in conducting an enterprise of a like character and with like

aims, violating 29 U.S.C. § 1104(a)(1)(B).

105.    Through the conduct described above, Argent caused the ESOP losses, for which it is liable. 29 U.S.C. § 1109(a).

**SECOND CLAIM FOR RELIEF**
**(Against Herbert and Gregor Wetanson for Violating their Fiduciary Duties)**

106.    Under Federal Rule of Civil Procedure 10(c), the Secretary adopts and incorporates by reference the averments and allegations in all prior paragraphs.

107.    Herbert and Gregor Wetanson were both active W BBQ officers, and together comprised W BBQ's two-person board of directors at the time of the ESOP Transaction, and for two years following the transaction. Herbert and Gregor Wetanson also appointed Argent to serve as plan trustee. Accordingly, both father and son had a fiduciary duty to act prudently and with undivided loyalty to the plan, and to prevent the plan from paying more than fair market value for W BBQ's stock.

108.    These duties required Herbert and Gregor Wetanson to, among other things, monitor Argent's performance to ensure that Argent did not breach its fiduciary duties. They failed to do so.

109.    First, Herbert and Gregor Wetanson, together with Shpigel, prepared and provided overly optimistic projections of W BBQ's future financial performance knowing that higher projections would result in a higher valuation by SRR, and that Argent would rely on the projections and the SRR Report in approving the ESOP Transaction.

110.    Second, Herbert and Gregor Wetanson knowingly negotiated for ESOP Transaction terms that disproportionately favored themselves at the expense of the ESOP's participants and beneficiaries.

111.    By failing in the ways listed above, Herbert and Gregor Wetanson:

      a.    Caused the ESOP to purchase W BBQ's stock for significantly more than

fair market value;

       b.     Failed to act solely in the interest of the ESOP's participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable plan administration expenses, violating 29 U.S.C. § 1104(a)(1)(A); and

       c.     Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conducting an enterprise of a like character and with like aims, violating 29 U.S.C. § 1104(a)(1)(B).

112.    Through the conduct described above, the Herbert and Gregor Wetanson caused the ESOP losses for which they are liable. 29 U.S.C. § 1109(a).

**THIRD CLAIM FOR RELIEF**
**(Against Herbert and Gregor Wetanson for Co-Fiduciary Liability)**

113.    Under Federal Rules of Civil Procedure 10(c), the Secretary adopts and incorporates by reference the averments and allegations in all prior paragraphs.

114.    29 U.S.C. § 1105(a) makes a fiduciary liable for breaches by their fellow plan fiduciaries if they participate "knowingly in . . . an act or omission of such other fiduciary, knowing such act or omission is a breach" or have "knowledge of a breach by such other fiduciary" but do not make "reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a)(1) & (3). This co-fiduciary liability is in addition to any liability a fiduciary may incur under any other provisions ERISA Part 4, which includes duties of prudence and loyalty under 29 U.S.C. §§ 1104 and 1106.

115.    As ESOP fiduciaries, Herbert and Gregor Wetanson are liable for any fiduciary breaches by Argent, and by each other, that they participated in or knew about but failed to remedy.

116.    As alleged above, Herbert and Gregor Wetanson provided overly optimistic projections of W BBQ's future growth and financial performance—even excluding failing restaurants from the ESOP Transaction—knowing that higher projections would result in a higher valuation by SRR and that Argent would rely on those projections and the SRR Report in approving final purchase price.

117.    Herbert and Gregor Wetanson also knew that Argent had agreed to terms that benefitted themselves, and the other sellers, rather than the ESOP.

118.    In addition, Herbert and Gregor Wetanson continued operating a Dallas BBQ location in the territory allotted to W BBQ by the trademark licensing agreement even after the ESOP Transaction. Upon information and belief, this conduct violated the terms of that agreement.

119.    Finally, Herbert and Gregor Wetanson knew that the shareholder rights agreement required them to ensure that a third independent member was appointed to W BBQ's board of directors within six months of the ESOP Transaction date, yet they kept full control over the board for two years after the transaction.

120.    As a result, Herbert and Gregor Wetanson both "participat[ed] knowingly" in fiduciary breaches, violating 29 U.S.C. § 1105 (a)(1), and had knowledge of fiduciary breaches but did not make "reasonable efforts under the circumstances to remedy the breach[es]," violating 29 U.S.C. § 1105(a)(3).

121.    Due to the conduct alleged above, Herbert and Gregor Wetanson caused the ESOP losses for which they are liable. 29 U.S.C. § 1109(a).

## FOURTH CLAIM FOR RELIEF
**(Against Argent and Seller Defendants for Engaging in a Prohibited Transaction)**

122.    Under Federal Rule of Civil Procedure 10(c), the Secretary adopts and

incorporates by reference the averments and allegations of in all prior paragraphs.

123.   As ESOP fiduciaries, Argent, and its appointing fiduciaries Herbert and Gregor Wetanson, were prohibited from causing or permitting the ESOP to engage in a transaction constituting the sale or exchange of property between the ESOP and a "party in interest" to the ESOP and were also prohibited from transferring any ESOP assets to a party in interest.  29 U.S.C. §§ 1106(a)(1)(A), (D).

124.   As President and 47% owner of W BBQ's stock at the time of the ESOP Transaction, Herbert Wetanson was a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(H).

125.   As Vice President and 47% owner of W BBQ's stock at the time of the ESOP Transaction, Gregor Wetanson was a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(H).

126.   As Chief Financial Officer of W BBQ at the time of the ESOP Transaction, Shpigel was a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(H).

127.   By causing the ESOP to purchase W BBQ's stock from the Seller Defendants through the ESOP Transaction, Argent, Hebert Wetanson, Gregor Wetanson, and Shpigel:

a.   Engaged in and caused the ESOP to engage in a transaction that they knew or should have known constituted the sale, exchange, or leasing of property between the ESOP and parties in interest, violating 29 U.S.C. § 1106(a)(1)(A); and

b.   Engaged in and caused the ESOP to engage in a transaction that they knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, violating 29 U.S.C. § 1106(a)(1)(D).

128.    Due to the conduct alleged above, Argent and Seller Defendants caused the ESOP losses for which they are liable. 29 U.S.C. § 1109(a).

## FIFTH CLAIM FOR RELIEF
**(Against all Seller Defendants for Knowing Participation in Argent's Fiduciary Breaches)**

129.    Under Federal Rule of Civil Procedure 10(c), the Secretary adopts and incorporates by reference the averments and allegations in all prior paragraphs.

130.    The Secretary may bring a civil action "(A) to enjoin any act or practice which violates any provision" of ERISA Title 1 or "(B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision" of ERISA Title 1. 29 U.S.C. § 1132(a)(5).

131.    In the alternative, by the conduct alleged above, Herbert and Gregor Wetanson are liable as knowing participants in breaches by Argent, and each other, and in a prohibited transaction.

132.    Seller Defendant Shpigel is also liable as a knowing participant. As W BBQ's Chief Financial Officer, he was actively involved in preparing W BBQ's projections, negotiating the terms of the ESOP Transaction, and managing the company after the transaction.

133.    Accordingly, all three Seller Defendants are subject to an order requiring them to make appropriate relief under 29 U.S.C. § 1132(a)(5), including by disgorging their gains from the prohibited transaction.

## SIXTH CLAIM FOR RELIEF
**(Against Argent for Entering into Indemnification Agreements that are Void under ERISA)**

134.    Under Federal Rule of Civil Procedure 10(c), the Secretary adopts and incorporates by reference the averments and allegations in all prior paragraphs.

135.    Any provision in an agreement "which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under [ERISA Part 4] shall be void as against public policy[.]" 29 U.S.C. § 1110(a).

20

136.    A fiduciary is impermissibly relieved of responsibility or liability for its ERISA fiduciary duties when an ERISA plan itself bears some of the burden of indemnifying the fiduciary for its fiduciary breaches. 29 C.F.R. § 2509.75-4.

137.    The indemnification provisions in Argent's engagement letter and the ESOP's trust agreement could require W BBQ—and, in turn, the ESOP as W BBQ's sole owner—to pay all of Argent's losses, costs, expenses, and damages incurred in connection with legal proceedings relating to Argent's ERISA violations as the ESOP's fiduciary and trustee.

138.    By potentially requiring the ESOP to indemnify Argent even where it has breached its fiduciary duties, the indemnification provisions are void under 29 U.S.C. § 1110(a).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary requests that this Court enter an Order:

1.    Requiring Argent and the Seller Defendants to restore all ESOP losses resulting from their fiduciary breaches, or knowing participation in fiduciary breaches, plus interest;

2.    Requiring Argent and the Seller Defendants to disgorge, and restore to the ESOP, all fees and profits earned from the ESOP Transaction and any fees later paid to them in relation to the ESOP and its assets;

3.    Declaring that the indemnification provisions in the engagement letter and post-transaction trust agreement are void under ERISA, enjoining Argent from seeking or receiving any payments under this indemnification provision, and requiring that Argent repay to W BBQ any amounts paid by W BBQ under this indemnification provision; and

4.    Granting such other relief as may be equitable, just, and proper.

Dated: <u>December 19, 2024</u>

Respectfully submitted,


For the Secretary:

SEEMA NANDA
Solicitor of Labor

JEFFREY S. ROGOFF
Regional Solicitor
New York Regional Solicitor's Office


   /s/
SUSANNAH R. KROEBER
Trial Attorney
Office of the Solicitor
201 Varick Street, Room 983
New York, New York  10014
Tel.:  646-264-3699
Fax: 646-264-3660

B. CARINA DE LA PAZ
Trial Attorney
Office of the Solicitor
201 Varick Street, Room 983
New York, New York  10014
Tel.:  646-264-3654
Fax: 646-264-3660